T.C. Memo. 1997-495



UNITED STATES TAX COURT



CHOATE CONSTRUCTION CO., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20781-95.                    Filed November 4, 1997.



Matthew J. Howard, for petitioner.

Larry D. Anderson, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined a $212,580 deficiency in petitioner's income tax for 1992.

William Millard Choate (Choate) is petitioner's founder and chief executive officer (CEO).  After concessions, the sole issue for decision is whether petitioner may deduct $1,010,000 in

compensation for Choate in 1992, as petitioner contends; $265,550, as respondent contends; or some other amount. We hold that petitioner may deduct $1,010,000.

Section references are to the Internal Revenue Code as in effect for the relevant periods. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioner

Petitioner's principal place of business was in Marietta, Georgia, when it filed the petition in this case.

Petitioner is a construction company that specializes in building medical facilities (e.g., operating rooms), biomedical and "clean rooms" for laboratories, highly sophisticated industrial and robotics facilities, and plants that manufacture glass. Businesses use "clean rooms" to manufacture computer chips and pharmaceuticals and for activities that require a sterile environment of up to 100 times cleaner than a hospital operating room.

Petitioner's 1992 tax year started on July 1, 1991, and ended on June 30, 1992. Petitioner became an S corporation on July 1, 1993.

B.   William Millard Choate

   1.   College and Early Work Experience

Choate graduated from Vanderbilt University around 1973 with a bachelor of arts degree.  After graduation, he worked for about a year for Boyce Steel Co., a structural steel fabrication company, where he estimated bids and fabricated structural steel.

Choate worked for Gray Construction Co. in Glasgow, Kentucky, approximately from 1974 to 1977.  He worked as an estimator, a project manager, an assistant superintendent, and a superintendent.  He returned to Nashville around 1977 and worked for about a year at Foster & Crayton Co. in a management training program and as an estimator and project manager.  He also worked as a concrete form worker and carpenter.

   2.   Toon Construction Co.

Choate was a manager at Toon Construction Co. (Toon) in Atlanta, Georgia, from 1978 to 1986.  Choate was Toon's chief of operations beginning in 1979 or 1980.

Choate hired David Barrett (Barrett) in 1981, assigned him to a construction project, and trained him.  Choate hired Patrick Freese (Freese) to serve as an estimator around 1985.  Choate hired Jeff Dudley (Dudley) in 1986.  Dudley had no background in construction.  Choate believed that Dudley would be good at

- 4 -

developing business.  Choate taught Dudley about construction and how to find construction job leads.

After 1986, Choate became Toon's president, the third highest person in the company.  Choate wrote a procedural manual for Toon.  Choate left Toon for about 6 months to serve as operations manager of the Southeast Division of the Carlson Construction Co.  After 6 months he returned to Toon.  Toon grew dramatically and its financial condition improved substantially while it employed Choate.

C.    Incorporation of Petitioner

Choate left Toon to incorporate petitioner in June 1989. Economic conditions in the construction industry were poor at that time.

Petitioner initially operated in Choate's basement. Petitioner did not pay Choate to use his home.  Choate initially owned all of petitioner's stock.  Choate has been petitioner's president, CEO, chairman of the board, and the only member of petitioner's board of directors since he incorporated it.

In 1989, Choate designed petitioner's logo, which petitioner still used at the time of trial.

Petitioner grew very quickly.  After 6 months, petitioner had four or five employees in its office and some field

superintendents.  Petitioner then moved into a 784-square-foot office.  In 1990, petitioner moved into a 10,000-square-foot office.  At that time, petitioner had about 39 employees.  In 1992, petitioner had 84 employees.  In 1994, petitioner moved into a 15,000-square-foot office.

D.    Choate's Role in Petitioner's Operations

    1.    Personal Investment of Time and Money

Choate worked only for petitioner after he incorporated it. He worked 16 hours a day, 7 days a week for the first 3 years, including the year in issue.  Choate took one vacation, lasting 4 days, in the first 3 years after he incorporated petitioner.

Choate lent all of his personal savings (about $450,000) to petitioner to help petitioner get surety bonds required to bid large jobs.  Choate reported $19,500 in interest income from petitioner for 1991, $19,500 for 1992, and $44,846 for 1993. Choate had contributed $402,475 in capital to petitioner by June 30, 1992.  Choate lent petitioner $50,000 on June 27, 1992, $100,000 on August 9, 1992, and $350,000 on September 10, 1992, at an interest rate of 13 percent; and $493,868.78 on December 31, 1992, at an interest rate of 5 percent.

2.  Petitioner's Manuals, Documents, and Procedures

Choate wrote petitioner's business plans for 1991, 1992, and 1993.  He wrote petitioner's training and procedural manuals and manuals for project superintendents and managers, fast track projects, program scheduling, preliminary cost reports, project controls, site analyses, and estimating procedures.  He also wrote petitioner's employees' handbook for 1990 and 1991.  Choate wrote petitioner's internal control documents, procedures for job site meetings, subcontractor safety, checklists for estimating bids for office buildings, check voucher forms, credit reports, daily reports, expense reports, and employment applications.  The procedures Choate developed worked in concert with petitioner's computer, scheduling, and accounting systems.

Petitioner rarely hired an attorney.  Choate negotiated contracts for petitioner.  He drafted and reviewed contracts, purchase orders, corporate resolutions, stock sale agreements, shareholders' agreements, promissory notes, profit-sharing plans, and deferred compensation agreements.  Choate handled claims from subcontractors.  No subcontractor claims against petitioner reached arbitration until 1995.

Choate authorized petitioner to issue section 1244 stock on July 27, 1989.

### 3. Computer Technology

Choate used computer technology to digitize site plans for three-dimensional topography and site analysis. He also digitized blueprints for buildings. This let estimators do in 30 minutes what formerly took several days. Choate kept current with computer-assisted design technology, and he integrated computer technology systems with petitioner's procedures.

### 4. Personnel and Training

Choate hired and trained petitioner's key employees the first 5 years and trained them in general construction and in the systems and procedures that he had developed for petitioner.

### 5. Business Development

Choate was principally responsible for developing petitioner's highly technical biomedical construction business. Other employees of petitioner often found leads for contracts. However, Choate was principally responsible for obtaining contracts for petitioner.

### 6. Awards

Entrepreneur of the Year Institute nominated Choate in 1992 and named him in 1993 as Entrepreneur of the Year in the southeast construction division. Selection of the Entrepreneur of the Year is based on financial statements, clients' opinions

about the firms' performance, and a personal interview relating to the business growth and performance of the nominee's firm in recent years.

E.    Choate's Assistants

    1.    Dudley, Freese, and Barrett

In 1989 and 1990, Choate hired Freese to estimate bids, Barrett to do interior work, and Dudley to pursue job leads. Choate trained Dudley, Freese, and Barrett.  Choate's training and education of Dudley regarding the construction industry was vital to Dudley.  Choate was Dudley's primary mentor in the construction business.

On June 30, 1990, Choate sold 500 shares of petitioner's stock to:  (a) Freese for $20,000, which Freese sold back around December 31, 1993, for $95,219; and (b) Barrett and Dudley for $27,518, which they each sold back around January 1, 1995, for $128,382.  Choate owned 85 percent of petitioner's stock when Dudley, Freese, and Barrett each owned 5 percent.  Dudley pledged his home as collateral to Choate to secure the loan from Choate that Dudley used to buy the 500 shares from Choate.

In 1992, Dudley, Freese, and Barrett asked Choate to split petitioner's profits based on stock ownership until a certain

target was achieved and to split profits above the target equally four ways.  Choate rejected this plan.

At the time of trial, Dudley and Barrett jointly owned a construction company and Freese worked for another construction company.

### 2.  Bunyard

In June 1990, Choate hired Ben Bunyard (Bunyard) to be a project manager.  Bunyard had previously worked in the construction business, but he learned more about project management from Choate than from anyone else.  Bunyard received a bonus in 1990.

### 3.  Page

On June 3, 1991, Choate hired David A. Page (Page) to be petitioner's chief financial officer, comptroller, and chief of computers.  Page had an accounting degree and had worked for a contractor.  He spent 15 to 25 hours each week with Choate during the first 3 months that he worked at petitioner, learning about computers, construction, and Choate's detailed cost accounting controls.  He and Choate usually reviewed checks from 4 p.m. to 11 p.m. on Thursdays.  They made notes and sent them to project managers.  They reviewed the reports project managers returned to accounting.

F.   Compensation Paid by Petitioner

Petitioner did not pay Choate for work he performed during its first 6 months.  For its fiscal year ending June 30, 1990, petitioner paid $202,000 to Choate and paid salary, wages, and other labor costs of $240,938.

Petitioner paid salaries and bonuses to its officers as follows:

| Fiscal year | Choate | Dudley | Freese | Barrett |
|---|---|---|---|---|
| June 30, 1990 | $202,000 | -- | -- | -- |
| June 30, 1991 | 156,250 | $72,200 | $46,042 | $63,000 |
| June 30, 1992 | 1,010,000 | 134,250 | 121,000 | 121,000 |

The record does not show how much petitioner paid Dudley, Freese, and Barrett during petitioner's fiscal year ending June 30, 1990.

Petitioner has always had a policy of paying bonuses to its employees.  The bonuses petitioner pays to its project managers and superintendents often exceed their salaries.  Petitioner paid bonuses based on the amount of work or revenues the employees produced.

Choate authorized bonuses for petitioner's officers and shareholders (himself, Dudley, Freese, and Barrett) on June 26, 1992.  Petitioner paid those bonuses in the fiscal year ending June 30, 1992, as follows:

| Officer | Percent of stock ownership | Bonus | Bonus as percent of bonus pool | Officers' total pay | Percent of officers' total pay |
|---------|---------|---------|---------|---------|---------|
| Choate | 85 | $935,000 | 82.75 | $1,010,000 | 72 |
| Dudley | 5 | 65,000 | 5.75 | 134,250 | 10 |
| Freese | 5 | 65,000 | 5.75 | 121,000 | 9 |
| Barrett | 5 | 65,000 | 5.75 | 121,000 | 9 |
| | | $1,130,000 | 100.00 | $1,386,250 | 100 |

Choate set these bonuses based on performance, but he did not use a formula to compute them.

Choate required Dudley, Freese, and Barrett to lend their 1992 bonuses to petitioner.

G.  Petitioner's Gross Sales, Taxable Income, and Retained Earnings

Petitioner grew dramatically during its first 3 years.

Petitioner reported income on its audited financial statements under the percentage of completion method of accounting and reported income on its income tax returns under the completed contract method of accounting.  Petitioner's gross sales, taxable income, and retained earnings under those two accounting methods are as follows:

| | Gross sales | | Taxable income | |
|------|---------|---------|---------|---------|
| Year | Completed contract | Percentage completion | Completed contract | Percentage completion |
| 1990 | $1,484,188 | $4,809,514 | ($218,807) | $228,317 |
| 1991 | 15,599,142 | 16,984,287 | 37,840 | 675,849 |
| 1992 | 26,066,541 | 30,042,011 | 1,101,512 | 381,409 |

| Retained earnings | | |
| Year | Completed contract | Percentage completion |
| --- | --- | --- |
| 1990 | ($271,603) | $147,885 |
| 1991 | (366,386) | 559,711 |
| 1992 | 585,554 | 786,282 |

The value of petitioner's stock increased as its retained earnings increased.

## H.   Return on Equity

Using the percentage of completion method, petitioner's return on equity (net profits; i.e., profits less taxes and compensation of the CEO, divided by equity) was about 37 percent for 1990, 75 percent for 1991, and 25 percent for 1992.

Under the completed contract method, petitioner's return on equity was about 2,665 percent for 1992.  Petitioner's average return on equity for 1990, 1991, and 1992 was 45.4 percent under the percentage of completion method of accounting and 842 percent under the completed contract method.  Petitioner paid $10,000 in dividends ($1 per share) on June 30, 1992.

## I.   Reynolds

Construction businesses are generally required to have a surety bond for the amount of the contract as a condition for submitting a bid and entering a contract.  Robert N. Reynolds

(Reynolds), a surety bond agent, worked with Choate for petitioner, and with Barrett, Freese, and Dudley for their own companies. Reynolds used the following criteria to evaluate the companies owned by Barrett, Freese, Dudley, and Choate when they sought surety bonds: (1) The character and integrity of the key individual, (2) the capacity and experience of the company to perform projects they want to undertake, and (3) the amount of cash in or the financial ability of the company to perform the contracts.

OPINION

A.  Contentions of the Parties

Petitioner deducted the $1,010,000 which it paid to Choate in 1992. Respondent determined and contends that it was unreasonable to pay Choate more than $265,550, and that part of the $1,010,000 was not for services that Choate rendered to petitioner in 1992. Respondent's determination is presumed to be correct. Rule 142(a).

B.  Background

A taxpayer may deduct a reasonable allowance for salaries or other compensation for services actually rendered. Sec.

162(a)(1).  A taxpayer may deduct compensation if it is:  (1) Reasonable in amount, and (2) purely for services.  Sec. 162(a)(1); Rutter v. Commissioner, 853 F.2d 1267, 1271 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267.  Thus, we must decide whether petitioner has shown that the compensation petitioner paid to Choate in 1992 was reasonable in amount and whether it was purely for services.

1.   Factors Considered in Deciding If Compensation Is Reasonable in Amount

Courts have considered many factors in deciding whether compensation is reasonable in amount, such as:  (1) The employee's qualifications; (2) the nature and scope of the employee's work; (3) the size and complexity of the business; (4) general economic conditions; (5) the employer's financial condition; (6) a comparison of salaries paid with sales and net income; (7) distributions to shareholders and retained earnings; (8) whether the employee and employer dealt at arm's length, and if not, whether an independent investor would have approved the compensation; (9) the employer's compensation policy for all employees; (10) the prevailing rates of compensation for

comparable positions in comparable companies; (11) compensation paid in prior years; and (12) whether the employee guaranteed the employer's debt.  Rutter v. Commissioner, supra; Owensby & Kritikos, Inc. v. Commissioner, supra; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court dated Nov. 16, 1948; R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972).  No single factor controls.  Mayson Manufacturing Co. v. Commissioner, supra.

2.   Post-June 30, 1992, Facts

The last day of the tax year at issue was June 30, 1992. Respondent objected to the admission of evidence relating to some post-June 30, 1992, events as irrelevant.[1]  Petitioner relies on events occurring after June 30, 1992, to show Choate's value to petitioner in the year ending June 30, 1992, and to rebut

---

[1] Respondent does not argue on brief that we should not consider events occurring after June 30, 1992.  On brief, respondent points out that Choate lent money to petitioner from June 2, 1992, to June 29, 1993, when he was receiving large bonuses from petitioner.  Respondent's expert testified that he would consider petitioner's 1994, 1995, and 1996 financial success in estimating Choate's reasonable compensation for 1992 because the performance of an officer in a construction company affects the firm in later years.

Dudley's and Freese's testimony that they were important to petitioner and Dudley's testimony that Choate was not.

We do not consider events occurring after June 30, 1992, in deciding the value of Choate's services in petitioner's fiscal year ending on that date, see Estate of Gilford v. Commissioner, 88 T.C. 38, 52-55 (1987), except as stated next. We consider Choate's 1993 Entrepreneur of the Year award as evidence that his 1992 compensation was reasonable because the selection process for the 1993 award had begun in 1992, and we believe that petitioner knew before June 30, 1992, about most or all of Choate's accomplishments that led to his receipt of the 1993 award. We do not consider petitioner's growth from 1993 to 1995 in deciding Choate's value to petitioner in 1992 because petitioner did not show that it knew in 1992 that the growth would occur.

C.   Reasonableness of Choate's Compensation

We next apply the factors listed above at paragraph B-1 in deciding whether the compensation petitioner paid to Choate was reasonable.

1.  <u>Employee's Qualifications</u>

An employee's superior qualifications for his or her position with the business may justify high compensation.  <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1158 (1980).  Respondent concedes that Choate was highly qualified for his position with petitioner.  This factor favors petitioner.

2.  <u>Nature and Scope of Employee's Work</u>

The duties performed by the employee, the hours worked, and the importance of the employee to the success of the company may justify high compensation.  <u>Rutter v. Commissioner</u>, <u>supra</u>; <u>Mayson Manufacturing Co. v. Commissioner</u>, <u>supra</u>.

Respondent concedes that Choate contributed significantly to petitioner's success but contends that Dudley, Freese, and Barrett contributed as much as Choate to petitioner's success.  We disagree.  Choate was clearly more important to petitioner than anyone else.  Reynolds, a surety bond agent, knew Choate, Barrett, Freese, and Dudley professionally.  He testified that Choate had a much greater ability than Barrett, Freese, or Dudley to develop petitioner.

Respondent speculates that Choate did not work as many hours as he claimed. However, no witness contradicted Choate's testimony about his own efforts, and Page, petitioner's chief financial officer, testified that he had never known anyone that worked as hard as Choate.

Respondent contends that it is common for a CEO to work long hours, suggesting that Choate's schedule was nothing out of the ordinary. However, respondent produced no evidence that CEO's commonly work as hard as Choate did.

Respondent points out that Choate was quoted in a magazine article giving Barrett, Freese, and Dudley credit for helping petitioner become successful. This fact is not contrary to the conclusion that Choate was more important to petitioner than his assistants.

This factor favors petitioner.

3. Size and Complexity of the Business

The size and complexity of a taxpayer's business are factors in deciding whether compensation is reasonable. Rutter v. Commissioner, supra; Pepsi-Cola Bottling Co. v. Commissioner, 528

F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974); <u>Mayson Manufacturing Co. v. Commissioner</u>, <u>supra</u>.

Respondent concedes that the construction industry is generally complex but contends that petitioner had not developed a niche in medical construction by June 30, 1992. Respondent's argument overlooks the fact that petitioner specialized in complex projects from its inception, such as hospital operating rooms, robotics facilities, high-quality glass-making plants, and "clean" industrial rooms, all built to exacting specifications. This factor favors petitioner.

4. <u>General Economic Conditions</u>

General economic conditions may affect a company's performance and thus show the extent of the employee's effect on the company. <u>Rutter v. Commissioner</u>, 853 F.2d 1267 (5th Cir. 1988); <u>Mayson Manufacturing Co. v. Commissioner</u>, 178 F.2d 115 (6th Cir. 1949). Respondent concedes that the construction industry was weak in 1992. Despite this, petitioner had become extremely successful by June 30, 1992. This factor favors petitioner.

5.    Petitioner's Financial Condition

The past and present financial condition of a company is relevant to deciding whether compensation was reasonable.  Home Interiors & Gifts, Inc. v. Commissioner, supra at 1157-1158.

Respondent concedes that petitioner had become financially successful by 1992.  Respondent points out that petitioner's gross and net profit margins for the fiscal year ending June 30, 1992, were 8.6 percent and 1.3 percent, which is less than the average of 9.8 and 1.6 percent for commercial construction contractors with receipts of $10 to $50 million, according to Robert Morris Associates (RMA) data.  We give this RMA data little weight because we doubt that the companies on which it is based were in only their third year of operation.

This factor favors petitioner.

6.    Comparison of Salaries Paid With Sales and Net Income

Courts have compared sales and net income to amounts of compensation in deciding whether compensation is reasonable. Mayson Manufacturing Co. v. Commissioner, supra.  Respondent concedes that Choate's compensation was a small percentage of

petitioner's gross sales.  For 1992, petitioner had gross sales of $26,066,541 under the completed contract method of accounting and $30,042,011 under the percentage of completion method.  This factor favors petitioner.

7.  Distributions to Shareholders and Retained Earnings

Courts consider the amount of distributions to shareholders in deciding if compensation is reasonable.  Mayson Manufacturing Co. v. Commissioner, supra.  The failure to pay more than a minimal amount of dividends may suggest that some of the amounts paid as compensation to a shareholder-employee are dividends, Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323, and warrant further scrutiny by the court, Edwin's, Inc. v. United States, 501 F.2d 675, 677 n.5 (7th Cir. 1974).  However, corporations are not required to pay dividends; shareholders may be equally content with the appreciation of their stock if the company retains earnings.  Owensby & Kritikos, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, supra at 1161.

Petitioner retained its earnings and did not pay dividends before 1992, when it paid dividends of $10,000. Petitioner needed to retain earnings to be able to obtain surety bonds which allowed it to bid on large contracts. Petitioner's retained earnings grew from negative $271,603 in 1990 to $585,554 under the completed contract method of accounting and from $147,885 to $786,282 under the percentage of completion method at the end of the year in issue. We believe a shareholder of petitioner's would be satisfied with these results.

Respondent points out that Choate wanted petitioner to elect S corporation status earlier than July 1, 1993, and that he thought that this case would have been unnecessary if petitioner had made the election earlier. Respondent contends that this shows that Choate's bonus was a disguised dividend. Respondent cites no case in which a court considered the fact that a business owner preferred S corporation status in deciding if compensation was reasonable. We disagree that Choate's wanting to elect S corporation status has any bearing here.

This factor favors petitioner.

8.  Whether an Independent Investor Would Have Approved Petitioner's Pay to Choate

If the employee and employer did not deal at arm's length, for example, if the employee is the employer's sole or controlling shareholder, the amount of compensation paid may be unreasonable.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1324.  Choate has been petitioner's majority shareholder at all times since Choate founded petitioner.  Thus, we must decide whether an independent investor would have approved petitioner's pay to Choate.  Id. at 1326-1327.  We believe that an independent investor would have approved Choate's compensation because his efforts led to its rapid growth and financial success.

The prime indicator of the return a corporation is earning for its investors is its return on equity.  Id.  In Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282, the U.S. Court of Appeals for the Ninth Circuit concluded that a rate of return on equity of 20 percent would satisfy an independent investor and would show that the employee was not exploiting his position with the taxpayer.

In this case, the return on equity for 1992 was about 25 percent under the percentage of completion method.

Respondent points out that we have calculated return on investment by dividing taxable income (before net operating losses) by shareholder's equity for each fiscal year. Wy'East Color, Inc. v. Commissioner, T.C. Memo. 1996-136. Respondent contends that, since petitioner was capitalized with $402,475, and petitioner's taxable income was ($218,807) and $37,840 in its fiscal years 1990 and 1991 under the completed contract method of accounting, its return on investment was negative for those 2 years.

We are not convinced by respondent's argument. The year in issue is 1992, not 1990 or 1991. Petitioner showed a substantial net profit and return on investment under the percentage of completion method for 1990 and 1991 and under either method in 1992. Dudley, Freese, and Barrett clearly received a good return on their investment in the stock of petitioner over a period that included the year in issue.

This factor favors petitioner.

9.   Petitioner's Compensation Policy for All Employees

Courts have considered the taxpayer's compensation policy for other employees of the business in deciding whether compensation is reasonable.  Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159.  This factor focuses on whether the entity pays top dollar to all of its employees, including both shareholders and nonshareholders.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1329-1330.

Petitioner paid Choate at the high end of the compensation range.  Petitioner points out that its project managers and superintendents often make more from bonuses (which are based on performance) than they do from salaries, but petitioner presented no evidence that its other employees were paid at or near the high end of the compensation range.  Cf. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1159-1160.

This factor favors respondent.

10.  Prevailing Rates of Compensation for Comparable
     Positions in Comparable Companies

In deciding whether pay is reasonable, we compare it to compensation paid to persons holding comparable positions in comparable companies.  Rutter v. Commissioner, 853 F.2d 1267 (5th Cir. 1988); Mayson Manufacturing Co. v. Commissioner, supra at 119.

Both parties produced expert testimony regarding this factor.  Petitioner's expert was Stephen D. Kirkland (Kirkland), and respondent's was Emmet James Brennan III (Brennan).

Brennan testified that Choate's compensation was 4.5 percent of petitioner's revenues while "top performing companies" paid their officers 2.6 percent of revenues.  Brennan stated that "high average" compensation to CEO's of similar-sized construction companies was $265,550.  Brennan stated that no Atlanta construction company similar in size to petitioner that answered his survey paid its CEO more than $500,000 in 1992.

Brennan did not show that the performance of the CEO's of the companies he considered was comparable to Choate's

performance or that the other companies were as successful as quickly as petitioner. Brennan's analysis is not helpful because he has not shown that he considered comparable firms and executives. We have said this about Brennan's testimony in other cases. E.g., Lumber City Corp. v. Commissioner, T.C. Memo. 1996-171; Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129; Alondra Indus., Ltd. v. Commissioner, T.C. Memo. 1996-32; Guy Schoenecker, Inc. v. Commissioner, T.C. Memo. 1995-539; Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153.

Kirkland's opinion is that reasonable compensation to Choate for 1990, 1991, and 1992 would have been an average of $539,416 per year. Kirkland based this amount in part on Choate's pay from Toon, his prior service to petitioner, the absence of benefits from petitioner, petitioner's return on equity, and Choate's success with petitioner.[2] Choate's pay from petitioner from 1990 to 1992 averaged $456,000. Kirkland said this was

---

[2] Kirkland noted that he found no boats or lakehouses, or relatives on petitioner's payroll, leading him to observe that petitioner is a very "clean" organization.

reasonable in amount, considering that Toon paid Choate $250,693 in 1983, $312,134 in 1984, $434,148 in 1985, and $460,000 in 1986. Choate's average pay from Toon for 1985 and 1986 was $447,074, slightly more than his 1990-92 average pay from petitioner. This fact tends to show that Choate's pay in 1992 was reasonable.

This factor favors petitioner.

11. Compensation Paid in Prior Years

An employer may deduct compensation paid in a year for services rendered in prior years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); R.J. Nicoll Co. v. Commissioner, 59 T.C. at 50-51. Respondent contends that petitioner's pay to Choate in 1992 did not include catch-up pay for 1990 and 1991. We disagree. Choate testified that his compensation for 1992 included catch-up pay for his services to petitioner before 1992. Choate received no pay in his first 6 months working for petitioner. Petitioner underpaid Choate in 1990 and 1991 to keep more cash in the company so that it could obtain surety bonds.

Choate awarded himself a large amount of catchup pay in 1992, when petitioner had become successful.

Respondent contends that we should disregard Choate's testimony because it was self-serving. We disagree. Choate's testimony was plausible and consistent with the objective evidence. Respondent offered no evidence to contradict Choate's testimony that petitioner intended to pay him catchup pay. Reynolds corroborated Choate's testimony.

Respondent points out that cases permitting catchup pay because of past undercompensation usually involve a substantial base period. See Lucas v. Ox Fibre Brush Co., supra (14 years); R.J. Nicoll Co. v. Commissioner, supra (13 years); Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6 (7 years); Comtec Systems, Inc. v. Commissioner, T.C. Memo. 1995-4 (12 years). Respondent concludes from this that a deduction for catchup pay is not available in a company's third year. We disagree. If a taxpayer otherwise qualifies, it may deduct catchup pay. The fact that petitioner could provide catchup pay quickly is another measure of Choate's success.

This factor favors petitioner.

12.   Employee's Guaranty of the Employer's Debt

In deciding whether compensation is reasonable, courts have considered whether the employee personally guaranteed the employer's debt.  See R.J. Nicoll Co. v. Commissioner, supra at 51.  Choate personally guaranteed petitioner's debt in the early years.

Respondent points out that in petitioner's fiscal year ending June 30, 1991, petitioner had a $250,000 line of credit at the prime rate guaranteed by a shareholder (presumably Choate), which there is no evidence petitioner used.  Respondent also contends that Choate profited by lending substantial amounts of money to petitioner in calendar year 1992 at an interest rate of 13 percent.  Despite this, there is no doubt that Choate personally guaranteed petitioner's debt.

Respondent contends that Dudley assumed financial risk for petitioner.  Respondent bases this on the fact that Dudley pledged his home as collateral to Choate when Dudley bought 5 percent of petitioner's stock.  Dudley did not assume financial

risk for petitioner; he simply assumed risk to buy stock for himself.

This factor favors petitioner.

13. Respondent's Other Contentions

Respondent cites Guy Schoenecker, Inc. v. Commissioner, T.C. Memo. 1995-539. In that case, we were not convinced that the taxpayer's CEO was exceptional or irreplaceable because an assistant or the CEO's son could do the CEO's job. The taxpayer's growth was similar to that of its competitors. The taxpayer had been in business for 10 years before the years in issue and had not had the rapid growth and success that petitioner did. Choate's performance was exceptional. There is no evidence that anyone else could have done what Choate did for petitioner.

In Tricon Metals & Servs., Inc. v. Commissioner, T.C. Memo. 1997-360 (decided after the parties filed their briefs in this case), we found that the compensation paid by the taxpayer exceeded a reasonable amount. However, in Tricon Metals, unlike this case, the taxpayer did not show that its operations were

highly technical or complex, that it paid compensation for services provided in prior years, and that its CEO had managerial skills unique to its industry, had founded a firm that became very successful in 3 years, or worked an inordinate number of hours.

14.  Conclusion

We conclude that the amount of compensation that petitioner paid to Choate in 1992 was reasonable.

D.  Whether Payments to Choate Were for Services

To be deductible, compensation must be purely for services. Sec. 162(a)(1); Rutter v. Commissioner, 853 F.2d at 1271; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323.

There is no question that Choate rendered services to petitioner.  However, respondent contends that petitioner's payments to Choate were disguised dividends and were not purely for services.  Respondent points out that Dudley and Freese testified that they believed their bonuses for 1992 were based on stock ownership; that Dudley, Freese, and Barrett each received $65,000 bonuses and Choate received a $935,000 bonus; and that

5.75 percent of the bonuses was paid to Dudley, Freese, and Barrett and 82.75 percent was paid to Choate, which is about in proportion to their stock ownership.

We disagree. We think a more likely view of this is that Choate's sale of his stock in petitioner to Dudley, Freese, and Barrett reflects Choate's assessment of their contribution to petitioner. Likewise, petitioner probably paid them about that portion of the bonuses because Choate continued to have the same assessment of them. We believe Choate set their bonuses based on his assessment of their work, not based on their stock ownership.

Choate credibly testified that the bonuses were for services rendered and were not based on stock ownership.[3] He rejected a plan which Dudley, Freese, and Barrett suggested to him to split profits based on stock ownership and split the excess equally four ways after a certain target was achieved.

Although Dudley and Freese testified that they believed that the bonuses were based on stock ownership, they also testified

---

[3] Choate decided how much stock he would allow Dudley, Freese, and Barrett to buy from him.

that their own bonuses were based on their work, not on their stock ownership. Dudley and Freese were inconsistent on this point. Choate, who made the decision, was not.

Respondent contends that the facts here are like those in Nor-Cal Adjusters v. Commissioner, T.C. Memo. 1971-200, affd. 503 F.2d 359 (9th Cir. 1974). We disagree. In Nor-Cal Adjusters, unlike in this case: (1) Bonuses were paid only to officer-shareholders and not to nonshareholder employees who did work similar to that done by officer-shareholders; (2) bonuses were exactly proportionate to stock ownership; and (3) the taxpayer's compensation plan was not based on a percentage of billings as were those of other independent insurance adjusting firms.

Respondent contends that this case is similar to Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 607 (9th Cir. 1968), affg. T.C. Memo. 1967-7. We disagree. In Pacific Grains, Inc. v. Commissioner, supra at 606-607, unlike this case: (1) The pay at issue did not include catchup pay for prior services, and (2) the taxpayer did not pay dividends and had no reason to accumulate earnings and not to pay dividends.

We conclude that petitioner paid the bonuses for services Choate rendered to petitioner.

E.    Conclusion

Based on the factors outlined above, we conclude that petitioner's compensation to Choate for petitioner's fiscal year ending 1992 was reasonable in amount and was paid purely for services Choate rendered to petitioner.

To reflect the foregoing and concessions,

Decision will be entered under Rule 155.